Filed 7/27/26  In re M.M. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | B351668 (Los Angeles County Super. Ct. No. 20CCJP02765) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. L.M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Appellant L.M. (Mother) challenges the juvenile court's order under Welfare and Institutions Code[1] section 366.26 terminating parental rights to her daughter M.M. (born 2022). Mother limits her challenge to the adequacy of the inquiry pursuant to the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California law (Cal-ICWA; § 224 et seq.) concerning whether M.M. is an Indian child.  The child's father, Oscar G. (Father), is not a party to this appeal.

We affirm the order terminating Mother's parental rights as the court did not abuse its discretion in finding the ICWA-related inquiry as to M.M. adequate, and substantial evidence supports that ICWA did not apply.

## FACTUAL AND PROCEDURAL BACKGROUND

We limit our factual and procedural summary to ICWA-related compliance issues presented by Mother's current appeal.

### A. Dependency Proceedings Before M.M.'s Birth

On May 19, 2020, before M.M. was born, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition alleging that Mother's history of

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

substance abuse placed M.M.'s siblings G.G. and L.G. at substantial risk of serious physical harm. The petition also alleged that Father had a history of substance abuse. On August 31, 2020, the court found all allegations in the operative petitions true and took jurisdiction over G.G. and L.G. (*In re G.G.* (June 30, 2026, B349076) [nonpub. opn.].)[2]

## B. DCFS Files a Section 300 Petition as to M.M.

In February 2022, Mother gave birth to M.M.

In March 2022, DCFS filed a section 300 petition on behalf of M.M. based on domestic violence between Mother and Father and Mother's substance abuse. On June 2, 2022, the juvenile court sustained an amended petition and asserted jurisdiction over M.M. while also continuing to assert jurisdiction over her siblings.

## C. ICWA-related Inquiry

### 1. *ICWA Inquiry of Maternal Relatives*

Between March 2020 and September 2023, DCFS asked Mother three times whether her children possibly had Native American ancestry. Mother consistently denied any such ancestry. She also filed parental notification of Indian status (Judicial Council ICWA-020) forms with the court indicating she did not have a reason to believe ICWA applied to M.M.

In April and May 2023, maternal grandmother C.M. (MGM) and maternal aunt Maria Cecilia M. denied any Native

---

[2] Pursuant to California Rules of Court, rule 8.200(a)(5), the parties' briefing incorporates by reference their briefing in this related prior appeal which also involved M.M. We accordingly rely upon our opinion in that appeal. (*Id.*, rule 8.1115(b)(1).)

3

American ancestry. MGM also stated that maternal grandfather (MGF), who had passed away 19 years ago, had no known Native American ancestry. Mother points to nothing indicating that members of Mother's family had lost touch with MGF before he died.

During a September 27, 2023 hearing, Mother stated for the first time that MGM was in an unspecified tribe.

In October 2023, DCFS twice spoke with maternal aunt E.M. and once with MGM. In each instance, they denied Native American ancestry.

On November 1, 2024, DCFS again asked Mother about any possible Native American ancestry. Mother declined to answer, stating she wanted to make the social worker's job difficult. However, on December 10, 2024, Mother denied that she or any known family member had Native American ancestry.

On July 30, 2025, DCFS inquired of maternal cousin Gerardo M. about Native American ancestry. He reported that Mother was Mexican and deeply rooted in ancient Mexican traditions, but not Native American.

On August 1, 2025, DCFS again asked maternal aunt E.M. about possible Native American ancestry, and she denied any.

On August 1, 2025, DCFS attempted to ask maternal cousin Julio F. about any possible Native American ancestry. He did not answer the call. DCFS left a voicemail and sent a text message requesting a call back but did not hear from Julio.

2.    *ICWA Inquiry Relating to Father*

On May 22, 2020, Father filed Judicial Council ICWA-020 forms with the court in which he denied having Native American ancestry.

4

On July 6, 2020, DCFS spoke with Father about his family. During that conversation, Father described that paternal grandfather (PGF) had been born in another country, although Father did not identify the country, and indicated PGF was not a United States citizen.

On April 6, 2022, DCFS contacted the paternal grandmother Maria D. (PGM) and asked her about Native American ancestry. PGM reported that her family does not have Native American ancestry and were born in Jalisco, Mexico.

On April 14, 2023, Father again informed DCFS that he did not have Native American ancestry. Mother also twice denied any knowledge that Father had any Native American ancestry.

During a May 25, 2023 hearing, the court asked Father whether he had information about PGF. Father stated that PGF was alive, but Father did not have his or paternal aunt's contact information. The court ordered DCFS to follow up with Father to discover any information regarding Native American ancestry of paternal relatives.

DCFS obtained PGF's first and last name and date of birth and asked Father for contact information for PGF. Father reported that he did not have contact with PGF or a telephone number for him.

On August 23, 2023, Father's attorney advised the court that Father had told him that his uncle (paternal great uncle) and a paternal cousin once removed had some tribal affiliation. Father did not have any contact information or dates of birth for these relatives but could provide their names. The court ordered DCFS to investigate Father's possible Native American heritage.

During a September 27, 2023 hearing, Father informed the court that paternal great uncle and paternal cousin once removed's tribal affiliation was Navajo.

On October 12, 2023, DCFS spoke with Father to obtain contact information for paternal cousin once removed, Tracy C., and paternal great uncle, Angel C. Father stated he did not have their contact information, that he would attempt to get it, and would provide it to DCFS. DCFS followed up with Father on October 18, 24, and 25, but Father did not have any contact information. DCFS again contacted Father on October 26, 2023, but Father did not respond.

On October 19, 2023, DCFS spoke with PGM to inquire about PGF's contact information and whereabouts. PGM stated that she was not in communication with PGF and did not know where he was. DCFS asked PGM if her daughter (i.e., paternal aunt) might have that information. PGM responded that her daughter might know where PGF was but that PGM could not provide her daughter's telephone number to DCFS without her daughter's consent. PGM never provided the requested contact information to DCFS.

On November 22, 2023, DCFS spoke with Father about his family's possible Native American ancestry. Father stated that he believed his father's lineage included Navajo. When asked to explain the basis for that belief, Father said his paternal family lived in Arizona and when he was young his paternal uncle Angel C. took Father to "pow wows" in Los Angeles. DCFS asked Father whether any relatives may have more information. Father reported that PGF might, but Father did not have contact information for PGF. Father also stated that paternal great uncle Angel C. (PGF's brother), paternal cousin once removed

6

Tracy C. (daughter to paternal great uncle Angel C.), or paternal great-great-grandmother Maria M. might have information about his Father, but he did not have contact information for any of them. Father also told DCFS that he had not heard of anyone in his family living on a reservation or receiving any services from the Navajo tribe. Father denied any Native American ancestry on PGM's side and stated that they are Mexican.

On November 29, 2023, DCFS again asked PGM if she had any information for PGF. She denied knowing any information such as his birthday, age, "or any ICWA information."

As of February 1, 2024, Father had not provided any additional ICWA information to DCFS. DCFS reported that Father, paternal aunt Maria S., and paternal aunt Nora G. lived with PGM in PGM's home. PGM had five children, but the other two were not identified in the record. DCFS asked PGM for contact information for paternal aunts, but PGM declined to provide that information.

On February 4, 2025, Father stated, "The court found that there is no ICWA, but I have East Navajo, my father Francisco G[.] use[d] to take me to the [p]ow-wow as a child and my uncle, Jesse C[.] . . . told me we were from the East Navajos, but I have never received medical treatment at an Indian health clinic." This was the first time Father identified PGF as taking him to pow-wows or provided the name of paternal uncle as "Jesse" instead of "Angel." Father stated that he did not attend an Indian school or receive a membership card and is not registered with the tribe. Father lost contact with PGF and paternal uncle when he was young. DCFS also reported, "The [paternal uncle] stated that he has previously provided the information above to the [c]ourt and it was determined that there was no ICWA," but

7

DCFS did not provide further information about this statement. Father agreed to provide new information to the court if he received any. As of March 24, 2025, Father had not provided any additional information.

On July 30, 2025, DCFS contacted Father to again inquire about Native American ancestry, but Father did not respond.

On August 27, 2025, Father denied having any knowledge that he had Native American ancestry. Father provided no explanation for his flip-flop on this issue.

3. *The Court's ICWA Findings*

Throughout the proceedings, the court made interim ICWA findings that there was no reason to believe M.M. was an Indian child as it received additional information on the issue.

4. *Order Terminating Parental Rights to M.M.*

On December 2, 2025, and January 9, 2026, the juvenile court held a section 366.26 hearing. A report prepared for the section 366.26 hearing contained approximately four single-spaced pages summarizing the ICWA-related inquiry performed by DCFS. The juvenile court found that M.M. was adoptable, found the parental-benefit exception did not apply as to either parent, and terminated parental rights as to M.M., freeing the child for adoption. The court made no statement regarding ICWA compliance during either day of the hearing.

## DISCUSSION

Mother claims that DCFS and the court failed to adequately inquire as to whether M.M. was an Indian child under ICWA and Cal-ICWA. This claim is properly before us given the appeal of the order terminating Mother's parental rights. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 10.) Given the efforts by DCFS to

8

inquire into whether M.M. was an Indian child (which it reported to the court), and the court's prior findings regarding ICWA, the record reflects an implicit finding by the juvenile court that ICWA did not apply as of the time of the section 366.26 hearing. (*In re E.W.* (2009) 170 Cal.App.4th 396, 404-405.)

## A.    Relevant Legal Principles and Standard of Review

Congress enacted ICWA " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.' " (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1128-1129.) An " 'Indian child' " is "[a]ny unmarried person who is under age 18 years of age and who is either of the following: [¶] (A) A member or citizen of an Indian tribe. [¶] (B) Eligible for membership or citizenship in an Indian tribe and is a biological child of a member or citizen of an Indian tribe." (§ 224.1, subd. (b)(1).)

Under Cal-ICWA, the juvenile court and DCFS "have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child." (*In re Dezi C.*, *supra*, 16 Cal.5th at pp. 1131-1132.) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

The initial inquiry includes asking the child's family, including extended family members, whether the child is, or may

9

be, an Indian child.[3] (§ 224.2, subd. (b)(1).) Extended family members include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c)(1).)

"Our Supreme Court has acknowledged that this duty of initial inquiry does not require interviewing 'every' extended family member; rather, where the juvenile court's finding that [DCFS] conducted an adequate inquiry and that ICWA does not apply is 'supported by sufficient evidence,' conditional reversal is not required 'even if the agency did not inquire of everyone who has an interest in the child.' " (*In re Bella L.* (2026) 117 Cal.App.5th 1284, 1290, citing *In re Dezi C.*, *supra*, 16 Cal.5th at pp. 1140-1141.)

The duty of further inquiry arises when the agency has "reason to believe" that an Indian child is involved. (§ 224.2, subd. (e); *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1132.) Reason to believe is statutorily defined as "information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).) "Further inquiry includes '(1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have

---

[3] Effective September 27, 2024, the Legislature amended section 224.2 to require DCFS to conduct its initial inquiry of extended family members upon its first contact with them. (*Id.*, subd. (b)(1); Stats. 2024, ch. 656, § 3.) The instant matter was pending both before and after this amendment.

10

information regarding the child's membership or eligibility in a tribe.'" (*In re Claudia R.* (2025) 115 Cal.App.5th 76, 85; see § 224.2, subd. (e)(2)(A)-(C).)

The juvenile court may find ICWA does not apply to a child's proceeding if it finds DCFS's "inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is an Indian child." (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1134; see § 224.2, subd. (i)(2).) The juvenile court's finding that ICWA does not apply " ' "implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

We review for substantial evidence the juvenile court's factual finding that ICWA does not apply. (§ 224.2, subd. (i)(2).) "[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1141.) " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101-1102.)

## B. Substantial Evidence Supported the Court's Finding that ICWA Did Not Apply on Mother's Side

Mother argues that DCFS failed to conduct an adequate ICWA inquiry as to the maternal side of her family because DCFS had had contact with the following relatives during the

11

pendency of the matter but did not ask them about possible Native American heritage: (1) maternal aunt Maria Montoya M., (2) maternal aunt Maria Guadalupe M., (3) maternal aunt Maria del Carmen J., (4) maternal first cousin once removed Kenneth M., and (5) maternal nephew Julio F. Mother does not contest the adequacy of the ICWA inquiry of her paternal relatives.

Preliminarily, we observe that Mother's citations to the record do not support her claim that DCFS spoke to a maternal aunt named "Maria Montoya M[.]" or that Mother has a relative by that name. Rather, the record indicates that DCFS spoke with a maternal aunt named "Maria M[.]" and that there are three maternal aunts named Maria: Maria Guadalupe M., Maria del Carmen J., and Maria Cecilia M. The maternal family's surname is M[.], meaning that in referring to "Maria M[.]," DCFS could have been referring to any of the three Maria sisters. Mother has not cited record evidence that she has a relative named Maria Montoya M. or that DCFS failed to conduct an adequate ICWA inquiry as to this person.

As to DCFS's failure to inquire of maternal aunt Maria Guadalupe M., maternal aunt Maria del Carmen J., maternal first cousin once removed Kenneth M., and maternal nephew Julio F., DCFS's investigation was adequate and substantial evidence supported the court's finding that as to maternal relatives, it had no reason to know or believe that M.M. was an Indian child.

Notwithstanding the facial requirements of section 224.2, courts do not read the statute that an initial inquiry be made of every single member of the child's extended family. (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1005-1006, disapproved on another ground in *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1152,

12

fn. 18; see *In re Dezi C.*, *supra*, at p. 1140 [the statute "does not require reversal in all cases in which every possible extended family member has not been asked about the child's Indian ancestry"].) DCFS "is not required to 'cast about' for information or pursue unproductive investigative leads." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053.)

Here, Mother, MGM, two maternal aunts, and a maternal cousin all denied that their family had any Native American heritage. MGM also stated that MGF, who had passed away 19 years earlier, had no known Native American ancestry. Because MGM denied any Native American ancestry on her or MGF's behalf, the court could reasonably conclude that asking the two other maternal aunts, cousin, or nephew would be unnecessary absent some indication these relatives' knowledge of the family ancestry was superior to MGM's knowledge. (*In re C.R.* (2025) 112 Cal.App.5th 793, 802.)

## C. Substantial Evidence Supports the Court's Finding that ICWA Did Not Apply on the Paternal Side

Mother argues that DCFS failed to inquire of paternal aunts Maria S. and Nora G., and failed to inquire with the BIA or the Navajo Nation about PGF's possible Native American ancestry.

As to Father's maternal relatives, DCFS's inquiry was adequate. PGM stated she had no Native American ancestry and that her family was from Mexico. Nothing suggests that paternal aunts (PGM's daughters) would have had superior knowledge as to PGM's own possible Native American heritage than PGM herself had. (*In re C.R.*, *supra*, 112 Cal.App.5th at p. 802.)

We also conclude DCFS's inquiry was adequate as to Father's paternal lineage. PGM denied having any ICWA

13

information about PGF. Father initially denied any Native American ancestry and asserted PGF was born in another country and not a United States citizen. Although Father later claimed a paternal great uncle and paternal cousin once removed might have some tribal affiliation, he later went back to denying any of his paternal relatives had Native American ancestry.

DCFS sought information to contact PGF directly from several sources; none was provided. Father had no contact information for the paternal great uncle or paternal cousin once removed that he sometimes claimed (and sometimes did not claim) had Navajo ancestry. Nor did Father have contact information for other relatives he claimed might have PGF's contact information.

In these circumstances, DCFS's inquiry was adequate. We recognize that "as a result of forced assimilation policies, 'younger generations lack[] knowledge of their Native American ancestry which may only be reclaimed by conducting [a] proper ICWA inquiry with extended family members and others more knowledgeable.'" (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1139.) But the failure to contact certain extended family members does not require automatic reversal; DCFS needs to contact those relatives "reasonably available to help the agency with its investigation." (*Id.* at p. 1140.)

DCFS concedes it spoke with Maria S. and Nora G. early in the proceedings but did not ask at that time about the family's possible Native American heritage. But the record also shows that DCFS later attempted to reach out to paternal aunts to ask ICWA-related questions by asking PGM (who was at that time responsive to DCFS) for the paternal aunts' current contact information. PGM declined to provide their current contact

14

information and then stopped cooperating. For his part, Father was unable to provide contact information for additional inquiries of relatives. This indicates either that he did not have it, or that any relatives he did contact refused to permit him to share their information with DCFS.

Because the facts did not provide any reason to believe that PGF was a tribal member or eligible for enrollment in a Native American tribe, DCFS was not required to contact the Navajo Nation or the BIA about PGF. (§ 224.2, subd. (e)(2).) Father was not an enrolled member of the Navajo Nation. Even accounting for potential generational loss of memory, Father knew that PGF was not born in the United States and was not a citizen. Father claimed only that PGF's brother and cousin once removed might have tribal affiliation, before then retracting that claim and saying he had no Native American ancestry. PGM also denied PGF had Native American ancestry before she stopped cooperating with DCFS. In these circumstances, the court did not abuse its discretion in impliedly finding that DCFS's inquiry was adequate, and substantial evidence supports the court's finding that ICWA did not apply.

## DISPOSITION

The order terminating parental rights as to M.M. is affirmed.

NOT TO BE PUBLISHED

                                        WEINGART, J.

We concur:


        ROTHSCHILD, P. J.



        M. KIM, J.